Ms. Hodge. Good morning, Your Honors. May it please the Court, my name is Kay Hodge and with my colleague Alan Miller and Kate Clarkburg who represent the petitioner-respondent, Lily Transportation Company, I will request at this time the opportunity to reserve three minutes of my time for rebuttal. You may. Thank you. This Court should deny enforcement of the NLRB decision that applies an irrebuttable presumption called, in this case, a successor bar and requires Lily, a successor employer, to recognize and bargain with the union that represented the drivers who had worked previously for Lily's predecessor, Pumpernickel. But you would not have an objection to a rebuttable presumption, is that what you're saying? I have no objection to a rebuttable presumption, but I think that a rebuttable presumption then takes into consideration a variety of the facts and circumstances, as you know, that is the thrust of our argument on the successor bar. Even if there's a rebuttable presumption, what do you do about the Levitz furniture holding that you didn't, what you submitted would not have rebutted the presumption because they were unauthenticated signatures? I don't believe that Levitz requires that the employer authenticate the signatures. What happened in this case, which often happens, is the employer went to the hearing, presented the testimony of General Manager Walsh, who testified that at the time that he got the call from the union, he knew, because he had already been told by employees that they were unhappy that, A, they did not get an increase that they had, the collective bargaining agreement provided in February of 2013, two, that they... Let me bring you back to the signatures, okay? As I understand it, before the board, the general counsel argued that the signatures were worth nothing because they were unauthenticated, citing Levitz furniture. I don't see in the briefs or the record that's been given to us any indication that you in any way responded to that before the board, and the board then included that as an alternative basis for its ruling and its decision, and then, as I understand it, there was no motion for reconsideration filed concerning that alternative grounds for the decision, and if that's, if I'm correct on that sequence, don't you have a significant waiver problem on that alternative basis for the decision? No, I believe that during the back and forth, if you will, even at the underlying board hearing, that the question came up about the, whether or not the proof was sufficient to determine whether or not the union continued to represent a majority of the employees, and I do believe that what is important under the board law is that you look at the time that Walsh denied, that's why I started there, denied recognition, if you will, and decided that he would not bargain with the union. At that moment in time, he had all of this information regarding the union's own actions. I think I'm trying to ask you a much more narrow point, so let me make it even narrower. Did you ever argue to the board that Levitt's furniture was not a correct holding of law? I believe that we argued that we met the Levitt's furniture requirement. Okay. And you argued that to the board before or after the board decision? Yes. I believe we argued it to the board. Well, when you say you argued that you met Levitt, do you mean that you met it in the sense that even without independent authentication, the signatures were prima facie sufficient? What we argued is that it was not the employer's burden to argue about the authentication of general manager Walsh, and also having presented them the documentary evidence, and having absolutely zero, no evidence being presented by the general counsel that suggested that a majority of the employees did support the union. So you were arguing that Levitt did not apply? We were arguing, I guess, both. I'm sorry, Your Honor. Okay. I think that it's both. Because to the extent that, well, Levitt's, in the sense that in Levitt's, in that case, the union clearly suggested that it did not, it continued to represent a majority of the employees. There was testimony and discussion about the authentication of those signatures. In the Lilly situation, which is the situation you have before you, the applying Levitt's, if you will, there was none of those facts occurred. Rather, what happened is that we had evidence about what had happened prior to Lilly's coming on the scene. So Lilly had nothing to do with it. The employees decided that they didn't want the union. Then thereafter, they were hired by Lilly. Then thereafter, they provided some documentary evidence to Lilly to support, and those were the signed signatures. I think that it is, the critical distinction is the failure on the part of the counsel for general counsel to have done anything. And I think it's important to remember. I thought we were on the, we were on the theory here that there is a rebuttable presumption at the very least. Yes. And that's not the theory under which the case was tried. The GC then has the rebuttable presumption that they don't need any evidence if they got a rebuttable presumption. You're then trying to rebut the presumption, and one of the things you rely on to rebut the presumption is the paper signed by a number of employees. Correct. And doesn't Levitz then pose the question of whether the board need properly take cognizance of that paper in the absence of authentication? Well, you know, Your Honor, I don't believe that that is true, and I think the only circuit that has actually addressed that specific issue, which is BA Mullet and Lumber, which is the Fourth Circuit, they rejected the theory that the employer would have to authenticate the signatures of the different employees, particularly because you have to recognize it in the context. And again, this is a matter of context of being in an NLRB situation. An employer can't just go up to the employees and say, gee, they just signed it. Is that really what you wanted? Because of the limitations that are imposed on an employer under the National Labor Relations Act. Let me ask you another question. As I understand the record, before any of those signatures were put on that, the union had contacted your client to try to negotiate, and your client had shut the union down, triggering the Lee-Lumber issue. What happened? So how do we get around, how do you get around Lee-Lumber given the inference of taint that is unusual to the bargain? Your Honor, with regard to the Lee-Lumber, I would argue that that's a second irrebuttable presumption, which I would ask this court to reject. I think the whole theory of the Lee-Lumber taint is belied by the actual facts that were presented in this case, which are, essentially, A, that all of the reasons for the employee's disaffection for the union arose because of what the union indisputably did, and we need to remember there were two representatives of the unions that were called as witnesses. The business agent, Mr. Gidland, testified as the general counsel's witness, and never, never said anything about, A, these issues related to taint, did not deny, did not deny the fact that the employees had not received their pay increase, did not deny. In fact, he confirms that he received a variety of phone calls, and he complained during his testimony about having all those phone calls, that he got all these phone calls, but he never says that he answered any of them or did anything as a result. That is why the, if you will, the irrebuttable presumption of taint, which in Lee-Lumber very specifically directs itself to the fact that if a union has to spend, if the employer has an incentive, if you will, to delay, then, in fact, it will lead to the disaffection of the employees because they will see that the union can't do anything for them. In this particular instance, that's not what happened. What happened is before Lilly Transportation got involved, the union had already, if you will, sunk its own ship, and it was now in a situation, and at the hearing, never provided a single ounce of explanation, and there was back and forth. If I could just go back to the original. I think you're asking us to adopt a rule, as I understand it, that says that if the employer determines that the union was already on shaky grounds with its membership prior to the successor coming in, then the successor can refuse to negotiate with the union without giving rise to any taint that would impede it from the subsequent gathering of signatures by the employees. I would argue, Your Honor, that if you apply what the board said in Levitz, which is that you have to look at what the state of mind was of the individual who, at the time when he was making this decision, about not accepting the demand for recognition and negotiation, it was that he knew of all of these facts, and therefore, he rejected. Subsequently, again, they got the written documentation. I would suggest to Your Honor that... So what test do we apply? If we have two situations, one, the union's been doing fine with its membership. Successor comes in, refuses to negotiate, taint. That's scenario one. Scenario two, which I think you're telling us is this case, union is having trouble with its membership. They're disaffected. Successor comes in, refuses to negotiate, and you would then say the taint is rebutted. What test do we apply in that second scenario to gauging the level and type of disaffection that's arisen between the union and its membership? I think the question that you would have is whether or not, at that moment in time, the individual, whether or not the company knew that a majority of the employees did not support the union. And in this particular instance, remember, we're talking about 18 out of 20. We're not talking about hundreds, but 18 out of 20 were disaffected. And the standard I would apply, frankly, is I'm not sure that I disagree necessarily with the person know at the time that the request for recognition and bargaining occurred, because in this particular instance, General Manager Walsh knew, and he had those facts in his mind, and he declined and he knew that a majority of the employees had complained to him about that situation. And I would point out, at the hearing, there was an opportunity for the Council for General Finance to examine General Manager Walsh, and none of this information, the speculation, if you will, was, in fact, known. And the key here is that you have two conclusive, irrebuttable presumptions on top of each other that are, in fact, not true, which led to the decision that was rendered in this case, an irrebuttable presumption would allow for consideration of the facts, and in weighing the facts, what you have to do, excuse me, Your Honor, is you have to look at employee rights and weigh them against labor stability. And in this case, neither employee rights to make a decision to refrain from union organizing was, in fact, at play, nor was there an issue of labor instability because of the fact that the employees had all rejected the union. Thank you. May it please the Court, Jared Cantor on behalf of the National Labor Relations Board. Two points, Your Honor, I want to begin with very quickly. Factually and legally, the company is a successor, and it had that obligation. It's not being disputed, and that's important to bear in mind throughout this entire proceeding, that we are, to my second point then, the Board's decision here concerns essentially an affirmative defense that the company is trying to raise, that despite having violated the law, we have an affirmative defense that gets us out of jail, if you will. What do you mean despite? I thought their argument is that they didn't violate the law. It's not a violation of law to be a successor corporation, certainly. It's the refusal, Your Honor, to bargain, that as we argue in the brief and as the Board decided, the company was its successor, and that they refused to recognize and bargain with the union. So the unfair labor practice stands. The question then is, despite having essentially, or as the Board found, violated the act, whether, similar to a right-line discharge, whether having discharged someone for a bad reason, you had another good reason there. And here the Board's looking at their affirmative defenses. They're saying that they would have an affirmative defense, or they would have at least a response to a presumption if the presumption were rebuttable. And in the course of doing that, they're saying Lee and Levitt would not be applicable to these circumstances. And the facts of union dissatisfaction, independent of the employer's view of unions, would succeed in rebutting the presumption. Isn't that their argument? But that's what they're arguing. The first point is, the Court would have to find that the Board's rule in UGL Unico is irrational, or it's arbitrary and capricious. But if the Court found that the Board was in error, because the presumption that the Board applied as an irrebuttable presumption was at most a rebuttable presumption, then the company ought to have the opportunity, should it not, to have a hearing on the issue of whether it's evidence of union disaffection, etc., is enough to overcome that rebuttable presumption, because the Board has not spoken to that issue. In the company's view, the Board has gotten off on the wrong foot by applying the wrong test, because it has treated this successive bar as an irrebuttable presumption. Well, Your Honor, respectfully, the Board's findings with regards to Levitt's and Lee Lumber are, in fact, findings. It resolves presciently if the Court were to toss the bar and find that the Board, despite all the deference given to the Board as the labor body for the nation, and generally as a federal agency, if the Court were to go that far, the Board then made findings of fact and conclusions of law on these two other issues. And, as we point out in our brief, we address Lee Lumber first and then Levitt's. Before the Court, or I should say, the first time Levitt's appears in any of the record below is in the Board's decision. The issue about a Levitt's finding that they had not authenticated doesn't appear to the Board's decision, and that's why they should have, pursuant to well-established policy, filed a motion for reconsideration making the claims that they're raising now, which would have preserved it for appeal. And that 10E is a jurisdictional bar, despite what they claim in their reply brief, that we're making procedural arguments here. That's a jurisdictional issue, and the Court lacks jurisdiction when a claim is 10E. With regards to Lee Lumber, there's been much discussion about what the record shows, and I think in preparing for argument today, one thing really jumped out at me. On November 4th, Lilley starts operations. On November 27th, the Union demands recognition. The Union's agent first calls and talks to Walsh, and Walsh says, we're not going to recognize you. And he's just a manner. He says, we're not going to recognize you. We don't want the Union here. Then he calls a higher official in the company. Same thing. Toyota doesn't want a Union. We're not going to recognize you. Don't want the Union. Then he's told to call counsel. Same thing. He's told, we're not going to recognize you. We don't want the Union here. The signatures don't show up for at least two weeks later. The last signature on those documents is December 11th. So their refusal to bargain on November 27th occurs long before they actually have any evidence that they're then relying on here that employees are unhappy. Now, they talk a lot about Walsh essentially pointing out that employees had been griping, mostly really about Pumpernickel. And clearly, Pumpernickel was circling the drain. The Union agent talked about the fact that, yes, they were in violation of the bargaining agreement, and that they were working with the company and had agreed that some of those benefits could be postponed in the hopes of trying to keep the company solvent. And despite all those best efforts, the company, in fact, did go into bankruptcy. But, and this gets us back to the primary issue here. The point of the successor bar here is recognizing that at this crucial juncture, with Pumpernickel going bankrupt, so employees can't seek redress there, the Union is also can't seek redress there at the time that they're going bankrupt. There's not much they can do. Then we have this new employer come in. And the purpose of the bar here is to allow a period of time in which things can stabilize. That the new employer, as an undisputed successor, will recognize and bargain with this Union for a minimum of six months time. And then employee rights can be protected during that time. And they pin much on Walsh that his testimony somehow shows that there And if you look at his testimony, a lot of these complaints are about Pumpernickel and how everything went down the drain with the bankruptcy. But that doesn't mean that it's employee disaffection. And certainly when you look at what's required when you're talking about disaffection with regards to a petition, you're looking for some concrete evidence. Because if you're trying to oust a Union, the ideal, of course, is going to be a board proceeding. A secret ballot election with a period of campaigning. And then on the other hand, the board law does allow some self-help. And what the board said in Leavitt's when it moved away from the good faith uncertainty and said that with regards to self, an employer self-help and relying on statements or some type of petition, that we're going to require, move away from that good faith uncertainty. And that we want, you know, it's always going to be at your peril, but you need to have essentially more concrete evidence. And that by the time the hearing comes around, that there's going to be a requirement of authentication. Now, of course, we're spending a lot of time on Leavitt's and Lee-Lumber. The primary issue the board would argue here is, in fact, that the board's creation of this, of the successor bar is reasonable, it was rational, it's a fact that the board is entitled to great deference in constructing that. And that there's really not much merit to their arguments that the board has due mode deference because of Supreme Court precedent or because it's flip-flop, as we point out in the River Street Donut's case, that the bar for an agency to change its mind and to create a new rule is not an extremely high bar. Well, it may not be an extremely high one, but this is the third time around the track on this particular issue. And what was the, what on the record indicates to us the justification for coming back to the present irrebuttable presumption? How was that justified as opposed to simply being an act of discretion? Well, Your Honor, what the board points out is partly that MV Transportation did not allow St. Elizabeth Hospital a time to percolate. That MV Transportation reflexively and negatively reacted to any fact that they would create a, that there should be this bar. And the board found that, and it says in UGL Unico that it's going to create this bar and it's going to let it see what happens, see how it affects labor law. In other words, it in effect says, okay, we're going to try once again and let's see what happens. When the board has changed its mind on the issue as frequently as it has in this case, isn't there an obligation to justify the most recent iteration by something more than simply saying let's see what happens? Well, it's not let's see what happens, it's that's the problem that it had with, part of the problems it had with MV Transportation. Really, the board is saying that we're going back to St. Elizabeth, that MV Transportation in tossing the rule did not have a really good basis and we're going back to the roots of St. Elizabeth. And the board, in what I would say is a very detailed and well thought out decision in UGL Unico, traces the roots of the successor bar going back and also looks at successorship in general and the very strong considerations there for the presumption. And what the board says in UGL Unico is that with the importance that successorship plays in labor law and with the importance of protecting the stability of bargaining relationships during this very critical time, that we are going to have this insulated period is another term the board uses. And that it's going to be this minimum of six months and then there's a burden shift if it has to go longer than that. And that during this time we're going to protect employees' rights, we're going to protect unions, and we're going to preserve this bargaining stability. And the board deserves deference on that despite the fact that it has changed its mind on this. And certainly it is not a yearly flip-flop. But it is a serial flip-flop. It's occurred a number of times. Yes, I think the board recognizes in UGL Unico in addressing the dissent that it certainly doesn't say that the dissent is completely off in left field. This is a close question and this is one that reasonable minds in terms of board members have disagreed with. And it certainly is something that the board could indeed change its mind on going forward. The board currently has two vacancies and they will be filled with the incoming administration. So isn't there some limitation on how often? I mean, it seems to me you can't have important administrative law principles, all right, run by a series of boards that changes its mind as often as some judges change neckties. Yes, Your Honor, and that I think has always been recognized by the fact that the board is a political creature. That the board members are expressly appointed and the majority switches based on the parties. But they're acting here not in a political capacity but in a quasi-judicial capacity. Yes, Your Honor, but it informs the fact that the change here has, that there are reasons for the change. And again, it goes back to what the board said about the dissent in UGL-UNICO. And it's not that that is a completely impermissible position, that it's a policy choice. And of course, policies often differ by board members and what their experience is and what their perspective is on labor law and where it goes too far and where it does not go far enough. So you're suggesting if we wait long enough, this case may go away? Well, that's entirely possible, Your Honor. But certainly this is a live case in controversy. And as I pointed out, none of these decisions flip instantly. They have all lasted several years. And I think stepping back broadly, a decision that certainly Lily would like this court to read would be, certainly stand out from the entire jurisprudence on successor law and adopting the rationales and disregarding what is some pretty firmly established principles from the board and from the Supreme Court. And it certainly, I think, would have the chilling effect of precluding any future board or it certainly would, from making policy decisions, that this is certainly not some bare bones footnote announcing a new principle. This is a well-thought decision. It's an ongoing dialogue that the board has had with itself over the years and it might continue to have. And for a court to say that that is impermissible, that what is contained in this decision here is just below the standard, the threshold, would certainly be extremely chilling in terms of the board looking at all of its rules going forward. And as the board points out in UGL Unico, the purpose of administrative law is constant development, change. Sometimes it's one step forward and two steps back, but it's a constant refinement. And this might be one principle that continues to go back and forth, as many board principles have gone back and forth several times. The voluntary recognition bar, for instance. But many of those decisions, after much back and forth and refinement and refinement, end up becoming settled. And I think it's important to point out here that, unlike simply going back to St. Elizabeth's, the board said we're refining the successor bar here. We understand what the critique is and so they've amended how it interacts with the contract bar and they've also now defined a reasonable period of bargaining. So it's simply not a flip-flop of copying and pasting the St. Elizabeth's decision and that is now the law again. That it is the board going through this reasoned process of deciding, as the agency charged with developing national labor law, what best effectuates the purposes of the act. Thank you, Your Honors. I rest on my brief. Thank you. Your Honor, I'd like to address a couple of the issues that were raised with the board. The first is let's keep in mind that the concept of an successor bar was rejected by the Sixth Circuit in the Landmark case, whose facts are very similar to this. And I would urge this Court to follow or to at least consider and hopefully to follow what Landmark did in the Sixth Circuit. The second thing is that the facts in Lilly are quite unusual. I've done this kind of work for far too many years, I think, and I  think that there is a lot of confusion. And so what the UGL Unico case is about is the usual circumstance. The theory of a presumption is that it ought to apply in the vast majority of situations. A rebuttable presumption says, ah, there might be a unique case. I believe that Lilly is that unique case and I believe that is why the presumption needs to be rebuttable. And if one looks and the suggestion that, well, you know, we didn't think that the board gave adequate explanation in MV transportation and that's why they did UGL, that's why they went back in St. Elizabeth's and that's why we changed the UGL Unico. Frankly, Your Honor, the concept of giving this idea of an irrebuttable presumption, a, quote, fair trial, let's try it for a while and apply it to a variety of employers without a factual basis in advance, is what you're not supposed to do. What you have, you might have a rebuttable presumption that constantly never sees any alternatives but whatever those facts are. And under Big Y, this circuit determined that the concept of a presumption versus irrebuttable is something of significant import and that the burden is on the board to show why it ought to be an irrebuttable presumption and they did not do that in UGL Unico. The other thing to keep in mind is two things. Number one, that this case puts essentially Lilly in a situation which had it been Pumpernickle, Pumpernickle could have just said we're not going to bargain with you. Unfortunately now, Lilly has a one-year, quote, unquote, insulated period in order to achieve for labor stability and that would not have been the situation for Pumpernickle. But finally, with regard to the suggestion of reconsideration, this was a case about the successor bar. That's what this case was, you know, the complaint provided as its gravamen and that is the major part of the decision. And therefore, because of that, any request for reconsideration would have been an empty gesture. It would not have changed the underlying circumstances and the board's rules specifically provide that you need not go through an empty gesture. The signatures or the amount of a showing of interest was in fact somewhat in play and everyone knew it. The board had the opportunity to cross-examine. General Manager Walsh and it just didn't get out the evidence that it needed. Thank you. Thank you.